Harrison D. DeBuys and Grace V. DeBuys v. Commissioner.
De Buys v. Commissioner
Docket No. 52331.
United States Tax Court
T.C. Memo 1956-128; 1956 Tax Ct. Memo LEXIS 170; 15 T.C.M. (CCH) 656; T.C.M. (RIA) 56128; May 24, 1956
Cyrus A. Neuman, Esq., Pan American Bank Building, Miami, Fla., for the petitioners. Hugh G. Isley, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioners' income tax for the year 1950 in the sum of $7,582.60 together with additions to tax in the sum of $1,722.48, under section 294 of the Internal Revenue Code of 1939 for failing to file a declaration of estimated tax within the time prescribed by law. The only issue presented for our decision in this case is whether respondent correctly determined that an apartment house sold in the taxable year by petitioner Harrison D. DeBuys (hereinafter sometimes referred to as petitioner), constituted property used in his trade or business as defined in section 117(j)(1). Petitioners contend that it *171 was held primarily for sale to customers in the ordinary course of business and therefore the loss resulting from its sale in the taxable year was deductible in full as a loss incurred in the ordinary course of petitioners' business. Findings of Fact Petitioners are husband and wife who have lived in Fort Lauderdale, Florida, since 1947. They filed a joint Federal income tax return for the taxable year with the then collector of internal revenue for the district of Florida. Prior to living in Florida, petitioners lived in Detroit, Michigan. Petitioner started in business as a mason contractor in Detroit, Michigan, in 1926. He first engaged in speculative building of houses in 1928 and in the same year began business as a general contractor. "Speculative building" describes the activity of a builder who buys land, erects a building thereon and then sells on his own account the real estate improved by the building. Petitioner continued in the building business until June 1932, at which time he had three speculative houses on the market which he was unable to sell. Because of the unfavorable economic conditions at this time, he took employment in the construction department of Ford *172 Motor Company until January 1934 when he resumed the building business. From 1934 to 1947 petitioner did speculative building, contract building and maintenance contracting. His principal business activity was that of maintenance contracting. Commencing in 1937 he operated all of his building and contracting activities under the name of Harrison Construction Co., a fictitious name, registered under the appropriate Michigan statute and used on letterheads, signs, and in the telephone directory. During the period 1928-1947 he built for speculation and sold some thirty to thirty-five two and three bedroom houses in the Detroit area. The gains on these sales were reported by petitioner as ordinary business income, even though many were held for more than six months. During these years petitioner was engaged in business as a speculative builder. In 1947 petitioner moved to Ft. Lauderdale, Florida, primarily for reasons of health. His intention as to his means of earning a livelihood in Ft. Lauderdale was to continue in the building and contracting business. After investigating market conditions he concluded that the building and sale of an apartment building would be more lucrative *173 than the speculative building of houses. Accordingly, petitioner's first building project in Ft. Lauderdale was the construction of an apartment building known as the Drummond Arms, the name being derived from petitioner's middle name. Construction was started in May 1947. This was a twenty-three unit cement block and stucco building on the Intercoastal Waterway in the Birch Estates subdivision of Ft. Lauderdale. It consisted of 8 hotel rooms, 14 efficiency apartments and one larger and better equipped efficiency apartment intended for the owner or manager. Because petitioner had not been in Ft. Lauderdale long enough to build up his own organization, he hired a general contractor on a small fixed-fee basis to do the construction work. Petitioner paid the bills weekly and spent all his time supervising the construction which was completed in February 1948. Petitioner had no Florida contractor's license or real estate license during 1947, 1948 and 1949. The cost to petitioner of the Drummond Arms Apartment was approximately $230,000. On April 5, 1948, petitioners executed a mortgage deed on the Drummond Arms securing the payment of their $100,000 promissory note to the Reliance Life *174 Insurance Company of Pittsburgh. The unpaid principal was due and payable by April 1, 1963. On the same date the petitioners executed a chattel mortgage deed, subjecting the furnishings of the 14 efficiency apartments, the 8 hotel rooms, and the owner's apartment to the aforesaid indebtedness. The furnishings of the owner's apartment were not purchased from the proceeds of the loan. Prior to the completion of the Drummond Arms Apartment, petitioner called numerous real estate brokers and told them the building was for sale. He talked to a real estate broker named Judd in September 1947, five months prior to the completion of construction. Petitioner told him he wanted to sell the building and discussed with him the question of what would be a reasonable sales price. Judd advised against adding a third floor because it would restrict the sales market. Judd began immediate efforts to sell the building and showed it to prospective customers prior to its completion. Also prior to its completion petitioner informed another broker named Raymond that it was for sale. Raymond talked to petitioner about a possible deal before the debris was cleaned up and before all the furniture had been *175 put in. Raymond's deal involved the exchange of the Drummond Arms for a family hotel in Scarsdale, New York. Petitioner told him he was not interested in such a deal since he wanted to sell the building for cash and commence additional building. Petitioner also told another real estate broker named Adams that it was for sale. When the building was 90% completed, Adams brought an elderly couple to see it, but no sale was made because the buyers wanted to add a third floor and learned from an architect that the cost of such an addition would be prohibitive. Numerous other brokers in Ft. Lauderdale were informed that the Drummond Arms was for sale either directly by petitioner or by word of mouth from other brokers. The original asking price set by petitioner was $265,000. This price was arrived at by discussions with Judd and by reference to the prior sale of a similar building for $260,000. Petitioner placed no "for sale" signs on the premises because he felt that they would cheapen the property which was located in an exclusive neighborhood. He also felt that purchasers for a building of such size would have to be located by brokers and relied entirely on them to advertise and make *176 known to the public that the building was for sale. At the time of completion of the Drummond Arms in February 1948, no sale had been made. February was the peak of the tourist season in Ft. Lauderdale and the demand for rental accommodations was intense. Petitioner decided to take in tenants while awaiting a sale because he needed the income to make his mortgage payments and because it would be much more saleable occupied than vacant. The building filled up immediately. Tenants were taken on a daily, weekly and monthly basis. Petitioner moved from the furnished apartment in which he and his wife were living, to the owner's apartment in the Drummond Arms which he occupied until its sale in 1950. He stayed on the premises as much as possible in order to manage it and also in order to help the brokers in any way that he could in effecting a sale. Several trunks of personal belongings and household possessions which petitioner had in storage were left in storage because petitioner regarded his stay at the Drummond Arms as temporary and hoped that a sale might take place at any time. On March 3, 1949, petitioner applied for exemption of the Drummond Arms Apartments from taxation as *177 provided by Florida law. In this application the petitioner stated: "I reside [in the Drummond Arms Apartments] and in good faith make the same my permanent home * * *. "The statements contained and agreed to herein are true and made in good faith." Prior to the completion of the Drummond Arms, petitioner discussed the purchase of an adjacent lot with its owner and also investigated other vacant lots in Ft. Lauderdale with a view toward building another apartment building. He made no purchase, however, because his capital was tied up in Drummond Arms and he was compelled to await its sale before commencing additional building. Throughout the years 1948 and 1949 the Drummond Arms was continuously held out for sale. Judd, Adams, Raymond and numerous other brokers showed prospective purchasers through the building. At such times petitioner frequently assisted them by showing the building and pointing out various features. This took place at all hours of the day and once as late as midnight. Throughout these years petitioner frequently telephoned the brokers to prod them and to inquire as to the status of prospective purchasers who appeared to be interested in the Drummond Arms. *178 Judd published a brochure containing photographs and a prospectus to answer inquiries resulting from advertisements which his office placed in the Wall Street Journal. Sometime during 1948 and 1949, petitioner also published a brochure used to solicit tenants for the Drummond Arms. In August 1948 petitioner reduced the asking price to 225,000 and in 1949 he reduced it further to $195,000. He was attempting to reach a level at which the property would sell and was willing to take a substantial loss in order to release his capital and enable him to continue with the building business. However, throughout 1948 and 1949 petitioner never received a bona fide offer in writing with respect to the sale of the Drummond Arms. In January 1950 petitioner received his first bona fide offer on the Drummond Arms. The offer was $142,000 plus the rental income until April. It meant a loss of over $60,000. Petitioner had two or three hours to think it over and decided to accept it. He did not want to stay in the building until April, but the purchaser insisted on those terms. Petitioner accepted the deal in order to release his capital and have the opportunity to recoup his loss by continuing *179 in the building business. Immediately after vacating the Drummond Arms in April, petitioner commenced the construction of three houses for sale in Coral Ridge subdivision of Ft. Lauderdale. They were completed late in 1950 and sold through brokers within two weeks of completion. Petitioner built houses, rather than another apartment building, because of his unfortunate experience with the Drummond Arms and because the market for houses appeared to him to be picking up. As soon as the first of the three speculative houses was sold, petitioner commenced the construction of another house across the street late in 1950. In 1951 petitioner completed this house, built another and sold both. In 1952 petitioner built and sold four more speculative houses, and in 1953 two more. Although several of the eleven houses built and sold in the period 1950 through 1953 were held for a period of more than six months, petitioner reported the gains on the sale of such houses as ordinary business income. During the early 1940's petitioner purchased for investment three old apartment buildings in Detroit. He did not build them and employed managers to take care of their operation. One was sold prior *180 to 1947 and the other two were sold in 1950 after the sale of the Drummond Arms. In their Federal income tax returns for the taxable years 1948, 1949 and 1950 petitioners reported gross rentals from these apartment houses as follows: Apartment
1948
1949
1950
Drummond Arms
$24,821.30
$29,697.42
$30,920.76
Buena Vista (Detroit)
4,271.00
4,416.00
2,852.00
Indiandale (Detroit)
14,433.46
14,383.73
11,929.23
Petitioners reported a net loss from the rental operation of the Drummond Arms for 1948 in the sum of $3,845.25, net income from such rentals for 1949 in the sum of $2,193.32, and net income from such rentals for 1950 in the sum of $20,264.18. On the sale of the two Detroit Apartments in 1950 petitioner realized gains of $54,525.46. On the sale of the Drummond Arms the petitioner sustained a loss of $61,608.54. In their 1950 return petitioners reported their gains from the sale of the two Detroit Apartments as gains from the sale of capital assets held for more than six months. In the same return petitioners reported the loss from the sale of the Drummond Arms Apartments as the loss from the "Drummond Arms Job", sustained in the ordinary course *181 of petitioner's business. In the notice of deficiency respondent determined that under the provisions of section 117(j), Internal Revenue Code of 1939, the loss sustained on the sale of the Drummond Arms should be reduced by the amount of the gains realized from the sale of the Buena Vista and Indiandale Apartments before the allowable ordinary loss is computed. The Drummond Arms apartment was held primarily for sale to customers in the ordinary course of petitioner's trade or business. Opinion KERN, Judge: The question presented herein for our decision is primarily a question of fact and in our ultimate finding we have decided in favor of petitioners. Respondent has made a forceful and persuasive argument in support of his contention that the apartment here in question was properly used in the petitioners' trade or business within the purview of section 117(j)(1) of the Internal Revenue Code of 1939[1], and was not, as petitioners contend, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." He has pointed out, inter alia, that petitioner never before or since the transaction in question built an apartment house *182 costing a quarter of a million dollars, that he already owned in 1947 for investment two other apartment houses and during 1948, 1949 and until the sale of the Drummond Arms in 1950 petitioner's only source of income was from apartment rentals, that he built the Drummond Arms by retaining the services of a local contractor, that he lived in the Drummond Arms for over two years in an apartment larger and better equipped than the others, that he filed an application for homestead exemption under Florida law stating that the Drummond Arms was his "permanent home", that he had no Florida real estate license or contractor's license in 1948 and 1949, and that petitioners claimed depreciation and deducted expenses in connection with the Drummond Arms in their returns for 1948 and 1949. *183 We have noted all the contentions of respondent but consider them insufficient to cause us to disregard the uncontradicted testimony of petitioner to the effect that he was for many years before the construction of the Drummond Arms and many years afterwards in the business of speculative building, that he built the Drummond Arms in continuation of that business, that he built it for the purpose of sale and continued to have that purpose at all times from its construction until it was finally sold in 1950, and also insufficient to cause us to disregard the testimony of five real estate brokers to the general effect that petitioners built the Drummond Arms for the primary purpose of selling it and continued to have that purpose at all times. That the sale in the course of petitioner's business as a speculative builder rather than the rental of the Drummond Arms was petitioner's primary purpose is clearly shown by the fact that he sold it at a considerable loss during a year when its rental income was high in order to obtain funds to continue in other speculative building activity. Decision will be entered under Rule 50. Footnotes
1. Sec. 117. Capital Gains and Losses. * * *
(j) Gains and Losses from Involuntary Conversion and from the sale or exchange of certain property used in the trade or business, - (1) Definition of property used in the trade or business. - For the purpose of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩